# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 05-266V
### Filed: December 29, 2014
### To Be Published

* * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| BOB and CARMEL MOONEY, parents | * | |
| of E.L.M., a minor child, | * | Autism; Attorney Fees and Costs; |
| Petitioners, | * | Excessive and Unreasonable Fees; |
| v. | * | Excessive Costs; Hourly Rate |
|  | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

Michael Cave, Esq., Cave Law Firm, Baton Rouge, LA, for petitioners.
Alexis Babcock, Esq., U.S. Dept. of Justice, Washington, DC, for respondent.

## DECISION AWARDING ATTORNEY'S FEES AND COSTS[1]

**Vowell,** Chief Special Master:

In response to petitioners' motion for a decision on the record in this case, I issued a decision dismissing their claim on December 19, 2013. On April 23, 2014, petitioners filed an application for final attorney's fees and costs. I find that the claim was brought in good faith and upon a reasonable basis and, for the reasons set forth below, that an award of fees and costs in the amount of $44,089.37 is appropriate.

## I. Procedural History.

On February 28, 2005, Mr. and Mrs. Mooney filed a short-form petition, authorized by Autism General Order #1,[2] for compensation under the National Vaccine

---

[1] Because this published decision contains a reasoned explanation for the action in this case, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to delete medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will delete such material from public access.

[2] Autism General Order #1 is published at 2002 WL 31696785 (Fed. Cl. Spec. Mstr. July 3, 2002).

Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[3]  [the "Vaccine Act" or "Program"], on behalf of their minor daughter, E.L.M.  By filing a short-form petition, petitioners joined the Omnibus Autism Program ["OAP"],[4] thereby asserting that E.L.M. had an autism spectrum disorder ["ASD"] and that one or more vaccines listed on the Vaccine Injury Table[5] were causal of this condition.

After the conclusion of the OAP test cases, petitioners were ordered to inform the court if they intended to continue to pursue their claim.  Order, issued April 29, 2011. On May 23, 2011, petitioners requested an extension of time to amend their petition, which was granted (Order, issued May 27, 2011), and on July 18, 2011, petitioners filed an amended petition that alleged a Table encephalopathy.  During an August 17, 2011 status conference, I noted that the filed records did not appear to support a Table encephalopathy claim.  *See* Order, issued August 18, 2011.  Petitioners filed a second amended petition on April 13, 2012, one virtually identical to the first amended petition. Amended Petition II.

Petitioners requested a hearing to establish the factual predicate for their Table claim, which was conducted in Sacramento, California, on July 26, 2012.  On July 3, 2013, I issued a combined Ruling on Facts and Order to Show Cause, in which I determined that the evidence failed to establish that E.L.M. suffered a Table encephalopathy and ordered petitioners to show cause by August 2, 2013, why I should not dismiss this case for a failure to establish entitlement to compensation.

Petitioners filed a response requesting that the "Court enter what is necessary in order for petitioners to exercise their right to appeal."  Petitioners' Response to Order to Show Cause at 1, filed Jul. 22, 2013.  Noting that factual findings do not constitute an appealable decision, respondent suggested in her response that I issue a renewed show cause order or dismiss the case for failure to prosecute.  *See* Respondent's Response, filed Aug. 12, 2013.  After I issued a renewed show cause order, petitioners filed a motion for a decision on the record.  Motion, filed August 29, 2013.

On December 19, 2013, I dismissed petitioners' case for failure to establish entitlement to an award.  Petitioners did not file a motion for review.

Petitioners applied for final attorney's fees and costs on April 23, 2014.  ["Fee App."] Respondent filed her response on May 9, 2014 ["Response"], and petitioners filed a reply brief ["Reply"] on May 19, 2014.

---

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986).  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2006).

[4] The OAP is discussed in detail in *Dwyer v. Sec'y, HHS*, No. 03-1202V, 2010 WL 892250, at *3 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

[5] 42 C.F.R. § 100.3 (2011).

## II. Applicable Law.

The Vaccine Act is extraordinarily generous in its provisions for payment of fees and costs. Motivated by a desire to ensure that petitioners have adequate assistance from counsel when pursuing their claims, Congress permitted the special masters to award attorneys' fees and costs even in unsuccessful vaccine claims. H.R. REP. No. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Cloer v. Sec'y, HHS*, 133 S.Ct. 1886, 1895 (2013); *Saunders v. Sec'y, HHS*, 25 F.3d 1031, 1036 (Fed. Cir. 1994).

As Judge Lettow has noted, "the Vaccine Program employs a liberal fee-shifting scheme." *Davis v. Sec'y, HHS*, 105 Fed. Cl. 627, 634 (2012). It may be the only federal fee-shifting statute that permits unsuccessful litigants to recover fees and costs. In more than 25 years of Vaccine Act litigation, very few unsuccessful litigants have been denied fees and costs awards, so long as jurisdictional requirements for payment were met. *See Jessen v. Sec'y, HHS,* No. 94-1029V, 1997 WL 48940, at *4-5 (Fed. Cl. Spec. Mstr. Jan. 17, 1997) (providing a detailed discussion of the fee structure under the Vaccine Act and its effect on the behavior and motivation of attorneys practicing in the Vaccine Program). Fees and costs may now be awarded even in untimely-filed cases. *Cloer,* 133 S.Ct. at 1895.

However, the Act limits payment to "reasonable attorneys' fees and other costs." 42 U.S.C. § 300aa-15(e)(1). The initial determination of reasonable fees is made using the lodestar method, in which a reasonable hourly rate is multiplied by the reasonable number of hours, to determine the amount of attorneys' fees to be awarded. *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) ("The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate" (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)); *see also Avera v. Sec'y, HHS*, 515 F.3d 1343, 1347-48 (Fed. Cir. 2008). The lodestar calculation may be adjusted upward or downward, "based on other specific findings." *Avera*, 515 F.3d at 1343 (citing *Blum*, 465 U.S. at 888). This standard for calculating attorneys' fees "is generally applicable in all cases in which Congress has authorized an award of fees." *Hensley v. Eckerhart,* 461 U.S. 424, 433, n.7 (1983).

In *Avera,* the Federal Circuit held that an attorney's reasonable hourly rate is "the prevailing market rate," which is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 895, n.11). The "prevailing market rate" is determined using the "forum rule." *Avera*, 515 F.3d at 1349 ("to determine an award of attorneys' fees, a court in general should use the forum rate in the lodestar calculation"). The forum rule dictates that the reasonable hourly rate be based on the rates paid to similarly qualified attorneys where the court sits, which in Vaccine Act litigation is

Washington, DC.  *Avera*, 515 F.3d at 1348; *see also Sabella v. Sec'y, HHS*, 86 Fed. Cl. 201, 205 (2009).[6]

In adopting the forum rule, the Federal Circuit also held that the *Davis*[7] exception to the forum rule applied in cases where the majority of an attorney's work is completed outside of the District of Columbia in a legal market where the prevailing attorneys' rates are "substantially lower."  *Avera*, 515 F.3d at 1349.  In *Davis*-exception cases, the appropriate rate of compensation is determined by using the prevailing market rate from the attorney's geographic location in the lodestar calculation.  *Id.*

In the instant case, all of the legal services were provided outside of Washington, DC.  Ordinarily, this would trigger the requirement to determine both the forum and local rates and to compare the two rates to determine whether the *Davis* exception to the forum rule applies.[8]  Here, however, respondent has asserted Baton Rouge rates should apply because "the rates charged in this legal market appear to be significantly lower" than those of the forum, Washington, DC.  Response at 4.  In their reply brief, petitioners did not challenge this assertion.  Moreover, the only evidence either party produced regarding hourly rates was focused exclusively on various legal services rendered in the Baton Rouge area.[9]  I conclude that the parties have therefore conceded that the *Davis* exception to *Avera* applies in this case.

---

[6] Prior to the *Avera* decision, special masters generally used the "local rate" to determine a reasonable hourly rate to award.  The "local rate" was determined based on the attorney's location and his or her billing rate there for similar services.  *See Avera v. Sec'y, HHS*, 75 Fed. Cl. 400, 405-06 (2007).

[7] *Davis County Solid Waste Management and Energy Recovery Special Service District v. United States Environmental Protection Agency,* 169 F.3d 755, 758 (D.C.Cir. 1999).

[8] Services in most Vaccine Act cases are rendered outside the forum, which the Federal Circuit has determined to be the District of Columbia.  *Avera*, 515 F.3d at 1348.  Although 400-650 claims have been filed annually since 2010, only a small number of cases involve hearings or other extensive proceedings and only about half of these hearings occur within the District of Columbia.  For this reason, the Federal Circuit's adoption of the *Davis* exception considerably complicates the determination of the correct hourly rate in fees cases in the Vaccine Program.  Thus, in most fees disputes over the hourly rate, the *Avera* methodology requires the special master to determine both the forum rate and the prevailing local rate.  The special master must then compare the two rates to decide whether there is a "very significant difference in compensation" favoring the forum (the language used in *Davis* (169 F.3d at 758) or whether the local rate is "substantially lower" (the language used in *Avera*, 515 F.3d at 1349).  In a compensation program involving all vaccine injury claims filed nationwide, and where very few petitioners' counsel are located in the forum, this three-step evaluation process can be difficult and cumbersome to perform.

[9] In support of their fee application, petitioners filed an affidavit from Michael L. Cave, an affidavit from another Louisiana attorney, Robert W. Barton, and a report detailing the hours and costs of Mr. Cave's legal representation.  Both of petitioners' affidavits focused exclusively on fees in the Baton Rouge area.  In their reply brief, petitioners also attached a United States Consumer Law Attorney Fee Survey Report (2010-2011) ("Attorney Fee Survey"), which listed average hourly rates for attorneys with various years of experience practicing consumer law.  Petitioners' Exhibit ["Pet. Ex."]. A at 26.  Petitioners only included information on the "South Region," which the index of regions indicated included Alabama, Arkansas, Georgia, Kentucky, Louisiana, Mississippi, Oklahoma, South Carolina, and Tennessee.  The "Atlantic Region," which included the District of Columbia, was omitted.  Pet. Ex. A at 6.  Respondent submitted an affidavit from Catherine Maraist, the Chief of the Civil Division, U.S. Attorney's Office, Middle District of

In determining the number of hours reasonably expended, a court must exclude hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434; *see also Carrington v. Sec'y, HHS*, 85 Fed. Cl. 319, 323 (2008) (noting that excessive hours should be excluded from an award). However, special masters are not required to perform a line-by-line analysis of the billing records. *Broekelschen v. Sec'y, HHS*, 102 Fed. Cl. 719, 729 (2011).

A special master has broad discretion in determining the reasonableness of a request for attorneys' fees. *See Avera,* 515 F.3d at 1347. Petitioners have the burden to demonstrate that the hourly rate requested is reasonable. *See Blum*, 465 U.S. at 895 n.11 ("the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation").

### III.  Discussion.

Petitioners requested a total award of $53,050.00 in attorneys' fees and $4,072.27 in costs for work performed by petitioners' counsel, Michael Cave. Pet. Ex. C at 1, 7. Respondent asserted that petitioners' request is "excessive and unreasonable" (Response at 2), because the requested hourly rate is not reasonable, the billing for time spent on some tasks should be reduced, and some of petitioners' requested costs are excessive. *See* Response. Respondent urges me to use my discretion and experience to reduce petitioners' request to a reasonable amount. *Id.*

To resolve this dispute, I must first determine a reasonable hourly rate for Mr. Cave. I must then determine the number of hours reasonably expended on tasks requiring a lawyer's skill and expertise and the number of hours to which a paralegal rate should apply. Finally, I must decide whether the costs claimed are reasonable and compensable.

A.  Reasonable Hourly Rate.

The hourly rate to be awarded is the primary issue in this dispute. Petitioners initially requested an hourly rate of $300.00 for all the work performed by Mr. Cave in this case. Affidavit ["Aff."] of Michael L. Cave at ¶ 7. Respondent requested that I award an hourly rate in the range of $175.00 to $225.00. Response at 5. In their reply

---

Louisiana, addressing her knowledge of the local market rates in the area in which petitioners' counsel practices. In addition, respondent cited recent federal court decisions addressing hourly rates for tort litigation in the Baton Rouge area. *Stogner v. Sturdivant*, No. CIV.A. 10-125-JJB-CN, 2011 WL 6140670 at *2 (M.D. La. Dec. 9, 2011); *Kador v. City of New Roads*, No. CIV.A. 07-682-DM2, 2010 WL 4638429 at *1 (M.D. La. Nov. 9, 2010); *Monaghan v. United Rentals*, No. 3:09-627, 2012 WL 832284 at *3 (M.D. La. March 9, 2012).

brief, petitioners reduced their requested hourly rate to $275.00 for work performed between 2005 and 2010.  Reply at 5.

Mr. Cave is a principal in the law firm of Cave Law Firm, L.L.C., in Baton Rouge, LA.  Aff. of Michael L. Cave at ¶ 1.  He has been practicing law for 15 years, since 1999. *Id.* at ¶ 3.  Based on data from the court's case management and electronic filing system ["CM/ECF"], he was admitted to the bar of the Court of Federal Claims on January 2, 2003.  He filed his first cases in the Vaccine Program in late 2002,[10] when he had been in practice for three years.  Between 2002 and 2008, he filed 35 cases,[11] 12 of which were consolidated and dismissed in 2005 as filed outside the statute of limitations.  *See Herbert v. Sec'y, HHS*, 66 Fed. Cl. 43 (2005) (lead case).  Since 2006, he has filed six non-OAP cases.

Outside the Vaccine Program, Mr. Cave primarily practices in the fields of "complex drug and product liability, medical negligence, railroad negligence, admiralty, and personal injury litigation."  Aff. of Michael L. Cave at ¶ 4.  He seems to be in a small family practice with one other attorney, who appears to be a relative, possibly his father. *See* http://www.legaldirectories.com/Cave-Law-Firm-A-PLC-28039-Frm.aspx.

The "local rate," which is "the prevailing market rate" for Mr. Cave's geographic location, Baton Rouge, LA, is determined by comparing Mr. Cave's requested rates to "similar services by lawyers of reasonably comparable skill, experience, and reputation." *Avera,* 515 F.3d at 1348 (quoting *Blum,* 465 U.S. at 895, n.11).  Unfortunately, there is relatively little guidance about how to determine "the prevailing market rate" for "similar services."  *See Information Sciences Corp. v. United States*, 86 Fed. Cl. 269, 291 (2009) (noting that although the Supreme Court held that paralegal fees are to be awarded at "prevailing market rates," *Richlin Sec. Service Co. v. Chertoff,* 553 U.S. 571, 590 (2007), the Court "did not provide trial courts with guidance in how to determine 'the prevailing market rate'").  To determine the local rate, I first must determine what constitutes "similar services" before determining the "prevailing market rate" for those services.

The parties' disagreement over the prevailing market rate in Baton Rouge centers on whether Vaccine Act work is similar to pharmaceutical, products, and medical device litigation or more analogous to medical malpractice, tort litigation, and Equal Access to Justice Act ["EAJA"] cases.  Neither party provided clear analysis

---

[10] He filed about 15 of these cases prior to being admitted to the bar of the court.  *See, e.g.,* No. 02-2050 (one of many cases showing a filing date of December 30, 2002).

[11] These were all OAP cases.  One of these 35 cases was a duplicate filing.  *See* No. 02-235V and No. 02-2051V.  With very few exceptions (primarily those petitions that appeared on their face to be untimely filed and the test cases themselves), all of the OAP cases, including Mr. Cave's, were stayed until litigation of the test cases began.  *Dwyer,* 2010 WL 892250, at *3.  Very little work was performed on any of Mr. Cave's OAP cases until after 2010, with the exception of the 12 cases dismissed in 2004.  I note that co-counsel, rather than Mr. Cave, argued the statute of limitations issue in these cases on the motion for review decided in 2005.

explaining how attorneys representing clients in the Vaccine Program perform services similar to those practicing pharmaceutical, products and medical device litigation or medical malpractice, tort litigation, and EAJA cases. They merely asserted that their comparison fields of litigation involved "similar services."

Petitioners base their argument about similar services on the affidavit from Mr. Barton, a partner at a large Baton Rouge firm. Mr. Barton asserts that his own usual hourly rate is $315.00 per hour for pharmaceutical, products, and medical device litigation, and that $300.00 per hour is a reasonable hourly rate for Mr. Cave's services. *Id.* at 5. Mr. Cave argues that the burden of proof for an off-Table claim under *Althen* "is basically the same required burden of proof in pharmaceutical, product, and medical device litigation." Reply at 3. While it is true that both vaccine cases and pharmaceutical, products, and medical device cases require preponderant evidence, so do medical malpractice, tort, and EAJA cases. Thus the "burden of proof" analogy is not helpful.

With their Reply, petitioners also provided an Attorney Fee Survey, reflecting a rate of $295.00 for consumer law attorneys in the "South Region" of the United States with eleven to fifteen years of experience at law firms typically comprised of four people or less. Reply at 5; Reply Ex. at 26. Once again, Mr. Cave did not explain why "consumer law" constitutes an apt comparison for fees purposes to Vaccine Act litigation.

Respondent relied on the affidavit of Ms. Maraist.[12]  Ms. Maraist stated that, based on her knowledge of the local market, the average rate charged by local medical malpractice attorneys ranges from $150.00 to $200.00 per hour. Aff. of Catherine Maraist, ¶ 3. She also referenced a recent decision concerning EAJA fees where a rate of $150.00 per hour was awarded to an attorney instead of the requested $171.00. *Id.* at ¶ 5. In addition, respondent cited recent federal court decisions addressing hourly rates in Baton Rouge tort litigation where courts awarded rates in the range of $155.00 to $220.00 per hour. *See* n.9, *supra.*

Neither party explained why the types of cases they referenced are similar to Vaccine Act litigation. Like petitioners, respondent merely asserted that "[she] believes that comparison to medical malpractice defense, tort litigation, and EAJA would all be

---

[12] I note that petitioners dispute Ms. Maraist's "familiarity with the local rates" because she is not in private practice, but instead employed by the U.S. Department of Justice. Reply at 2. While I do not rely heavily on affidavits of local attorneys such as Ms. Maraist or petitioners' affidavit from Mr. Barton, it would be unfair to attribute greater bias to Ms. Maraist's affidavit simply because of her employer. She is not associated with the U.S. Department of Justice's Vaccine/Torts Branch, Civil Division. Rather, as Civil Chief for the U.S. Attorney's Office in the Middle District of Louisiana, Ms. Maraist would likely be familiar with hourly fees charged by attorneys in the Baton Rouge market. I can appreciate that such information might derive from her interaction with other parties rather than her personal experience in billing clients. However, I fail to follow petitioners' logic in arguing I should give little weight to her affidavit because of the nature of her employment with the government. Her employment does not make her any more biased or less reliable than Mr. Barton's employment as a plaintiff's attorney makes him.

appropriate" as a comparison to Vaccine Act practice.  Response at 6.  Telling me why such comparisons are apt would be far more helpful than simply asserting that they are.

In *Rodriguez*, the Federal Circuit noted that proceedings under the Vaccine Act "involve no discovery disputes, do not apply the rules of evidence, and are tried in informal, streamlined proceedings before special masters well-versed in the issues commonly repeated in Vaccine Act cases."  *Rodriguez v. Sec'y, HHS*, 632 F.3d 1381, 1385 (Fed. Cir. 2011).  The Federal Circuit noted the relatively "relaxed legal standards of causation" and "eased procedural rules compared to other federal civil litigation."  *Id.* Likewise, "a party need not 'prevail' under the Vaccine Act in order to receive an award of attorneys' fees."  *Id.*

In the absence of analysis by the parties, I will rely on my own experience in and outside the Vaccine Program.  Having performed tort, personal injury, and medical malpractice defense work myself, I have a basis for comparison, and I find that Vaccine Act work is more analogous to tort, personal injury, and medical malpractice litigation than consumer law or medical products liability cases.  This is particularly true in claims brought under the Federal Tort Claims Act ["FTCA"], 28 U.S.C. §1346(b), §1402(b), §2401(b), and §§2671-2680.[13]

FTCA cases, like Vaccine Act cases, are heard in bench trials.  Although the analogy between the two types of litigation is not perfect, there are distinct similarities. Both medical malpractice and Vaccine Act cases rely heavily on medical records.  Both types of cases often turn on factual disputes regarding what happened and when it occurred.  Expert opinions often address the correct diagnosis, identify pre-existing conditions, and offer opinions regarding how the injury occurred.  Procedurally, FTCA work is more difficult, in that the Federal Rules of Evidence apply and discovery is much more extensive.  Vaccine Act work can be more difficult medically and scientifically, given that the focus is on causation in cutting edge areas of science and medicine, rather than the focus in many medical malpractice cases on what constitutes the standard of care and whether it was breached.

Pharmaceutical, products, and medical device litigation all have some parallels to Vaccine Act work, but the focus in such litigation is often on the product manufacturing and testing process in an effort to show that the products were defectively designed or manufactured.  In contrast, the Vaccine Act itself acknowledges, via the Vaccine Injury Table,[14] that vaccines can cause injuries.  When cases involve off-Table claims, the litigation focus is on causation, not the design, testing, and manufacturing process and, particularly, not on fault.

---

[13] *Contra Rupert v. Sec'y, HHS*, 55 Fed. Cl. 293, 304 (2003) (finding that insurance medical malpractice defense was not an apt comparison to representing petitioners in Vaccine Act case); *but see Barber v. Sec'y, HHS*, No. 99-434V, 2008 WL 4145653, at *8, *12 (Fed. Cl. Spec. Mstr. Aug. 21, 2008) (finding medical malpractice defense work by attorneys retained by individual physicians an appropriate comparison to Vaccine Act work, noting that both types of cases require similar skills).

[14] *See* 42 C.F.R. § 100.3(a).

I will attribute greater weight to the evidence related to hourly rates claimed by attorneys in medical malpractice and other tort cases in determining the prevailing market rate for services similar to Vaccine Act work in Baton Rouge, LA.  Unfortunately, the only evidence filed by a party pertaining to medical malpractice work is Ms. Maraist's affidavit.  Ms. Maraist stated that, based on her knowledge of the local market, the average rate charged by local medical malpractice attorneys ranges from $150.00 to $200.00 per hour.  Although this information is useful, it is anecdotal, rather than supported by references to such cases. Respondent also cited to several federal court decisions dealing with hourly rates in other types of tort litigation in the Baton Rouge area.[15]

A special master may look to other evidence in establishing a reasonable hourly rate.  *Rupert v. Sec'y, HHS*, 52 Fed. Cl. 684, 688 (2002).  By applying the *Blum* requirement that fees should be based on those that are paid to "lawyers of reasonably comparable skill, experience, and reputation" (465 U.S. at 895, n.11), I found some relevance in comparing Mr. Cave to another Louisiana-based attorney practicing in the Vaccine Program, Ms. Jessica W. Hayes.

Ms. Hayes is employed by the Murray Law Firm, located in New Orleans, LA.  This firm is larger than Mr. Cave's small family practice,[16] but the Murray Law Firm also appears to have originated as a family firm.  According to her firm's website (http://www.murray-lawfirm.com/attorneys/), the firm has fewer than ten lawyers.  Ms. Hayes joined the firm in 2004, having been admitted to the bar in that same year.  She lists her practice areas (in addition to vaccine work) as environmental, products liability, and personal injury law, and claims extensive experience in complex litigation.  *See* http://www.murray-lawfirm.com/attorneys/jessica-w-hayes/.

Court records indicate that Ms. Hayes was admitted to practice before the U.S. Court of Federal Claims in February 2008, five years after Mr. Cave was admitted in 2003.  However, it does not appear that anything substantive was done in any of Mr. Cave's OAP cases until 2004, when he responded to the motions to dismiss in 12 of his cases.  Mr. Cave was not required to file anything of substance in the remaining cases until 2008.  *See, e.g.,* docket sheets in *Marks v. Sec'y, HHS*, No. 02-2068; *Pincus v. Sec'y, HHS*, No. 04-243.[17]  He filed his first non-OAP case in 2006, and was required to

---

[15] These recent federal court decisions awarded hourly rates for tort litigation in the Baton Rouge area ranging from $155.00 to $255.00 per hour.  Resp. at 6; *see* n.9, *supra*.

[16] At some point during the pendency of this litigation, the firm had other attorney employees and associates.  *See Cave v. Comm'r*, 476 Fed.Appx. 424, 428 (5th Cir. 2012).  Unfortunately, this decision does not address the hourly rates of the firm's other employees.

[17] During the period between the OAP test case hearings, and the final appellate review of the test case decisions, petitioners in most of the remaining OAP test cases were ordered to file some medical records and a statement regarding onset in order to position those cases for resolution, once appellate review was completed.  Mr. Cave's clients received such orders primarily in 2008.

begin perfecting it almost immediately thereafter.[18]  Like Mr. Cave, Ms. Hayes' first Vaccine Act work involved OAP cases.  *See White v. Sec'y, HHS*, No.04-337V, 2011 WL 6176064 (Fed. Cl. Spec. Mstr. Nov. 22, 2011); *Smith v. Sec'y, HHS*, No. 04-338V, 2011 WL 1467933 (Fed. Cl. Spec. Mstr. Mar. 28, 2011).  More recently, she has filed petitions on behalf of individuals with injuries other than autism spectrum disorders. *See Abdulrahman v. Sec'y, HHS*, No. 12-391V, 2014 WL 6660721, at *1 (Fed. Cl. Spec. Mstr. Nov. 3, 2014).

Based on my experience with both attorneys, in and out of the OAP, I find that they exhibit similar legal skills in status conferences, filings, and docket management.  I have observed Mr. Cave in two hearings, but have not had the opportunity to observe Ms. Hayes.  Mr. Cave has an edge in experience, both in and out of the Vaccine Program, but the difference in experience is not great.  Both attorneys practice in similar legal markets,[19] and have handled comparable Vaccine Act cases consisting primarily of OAP cases initially and later branching out to represent petitioners in other Vaccine Act cases.  They claim similar areas of expertise.  Mr. Cave is a principal in his very small law practice and has been in practice about five years longer than Ms. Hayes.  On the other hand, Ms. Hayes has been recognized as a Louisiana Rising Star by *Super Lawyers* and Mr. Cave does not have a similar accolade.  *Compare* http://www.murray-lawfirm.com/attorneys/jessica-w-hayes, with Pet. Ex. A at 1-2.  Considering these factors, I find Ms. Hayes' practice in the Vaccine Program an appropriate starting point in determining "reasonable attorneys' fees" for Mr. Cave using "the prevailing market rate" for Baton Rouge, LA from 2005 to 2014.

In most of Ms. Hayes's OAP cases, she requested and was awarded an hourly rate of $150.00 for her efforts throughout all years of the litigation.  An example of one such case is *Rice v. Sec'y, HHS*, No. 07-63V.  However, in the 2012 fees application in *Rice*, Ms. Hayes presented a well-documented argument that the appropriate market rate for her services at that time was $250.00 per hour.  Nevertheless, in recognition that much of the work she performed in her OAP cases occurred several years prior, including her work in *Rice*, she requested only $150.00 per hour.[20]  I am aware that in recently filed cases, Ms. Hayes has requested and received the $250.00 per hour rate.

Mr. Cave points to the hourly rate of $275.00 that he claims I awarded him in *Hayes v. Sec'y, HHS*, No. 06-738 (2010) as evidence that an hourly rate of $275.00 is

---

[18] *Hayes v. Sec'y, HHS*, No. 06-738 (2010) is discussed below.

[19] The cases cited by respondent aided me in determining that "the prevailing market rate" in New Orleans, after the devastation of Hurricane Katrina, should be considered parallel to that of Baton Rouge. *Stogner*, 2011 WL 6140670, at *2, n.4.  Since Hurricane Katrina struck New Orleans on August 29, 2005, the two cities have constituted a similar legal market throughout most of the period of Mr. Cave's representation of petitioners.

[20] The parties' stipulation appears to reflect the $150.00 per hour rate.  *Rice*, Decision Awarding Attorneys' Fees and Costs at 2 (dividing the fee awarded by the hours requested yields an hourly rate of approximately $150.00).

appropriate.  Reply at 5.  Although this case provides some evidence of Mr. Cave's billing rate, I did not approve any specific hourly rate because the decision awarding fees and costs was based on a stipulation.  Mr. Cave claims that "[u]sing the rate of $275.00 per hour, a stipulation was reached between the parties" in the *Hayes* case. Reply at 5.  A closer examination of the facts and procedural history indicates that my award of fees and costs could as easily be read to support a lower hourly rate.[21]

Even if I accept petitioners' claim that Mr. Cave's hourly rate in *Hayes* was set at $275.00, that rate was the result of an agreement between petitioners and respondent. In this case, respondent disagrees with petitioners' requested hourly rate.  Response at 4, 6.  Nevertheless, I have considered the award in *Hayes* and the requested hourly rate as some evidence in this case of what a willing buyer would pay a willing seller for legal services performed by Mr. Cave.[22]

Petitioners bear the burden of demonstrating that petitioners' requested hourly rate is reasonable.  *See Blum*, 465 U.S. at 895, n.11.  In the absence of sufficient reliable evidence submitted by petitioners, I have used my experience in the Vaccine Program and the Consumer Price Index to arrive at reasonable hourly rates for an attorney of Mr. Cave's competence and experience performing services in the Vaccine Program.  *See Hensley*, 461 U.S. at 434.

I conclude that, for Vaccine Program work, the 2005 "local rate" in Baton Rouge, LA, for attorneys with five or more years of experience was $175.00 per hour.  In 2014, the rate for attorneys with ten or more years of experience is $275.00 per hour.

Extrapolating from these points of reference, and considering both the Consumer Price Index for cost of living and the increase in Mr. Cave's experience over this range; I award Mr. Cave a rate of $175.00 per hour for 2006, $181.00 per hour for 2007, and $186.00 per hour for 2008.  Mr. Cave had more than 10 years of experience as an attorney in 2009.  Therefore, extrapolation from the $275.00 per hour rate for 2014 by applying the Consumer Price Index results in hourly rates of $248.00 per hour for 2009, $253.00 per hour for 2010, $261.00 per hour for 2011, $266.00 per hour for 2012, and

---

[21] Petitioners prevailed on their entitlement claim in *Hayes*.  Because the fees decision was based on an agreement of the parties, I did not approve any specific hourly rate.  A total of $67,333.75 in fees and $16,031.07 in costs was requested in *Hayes*.  Pet. Mot. at 13, ECF No. 81.  Mr. Cave sought compensation for 244.85 hours, which if awarded at $275 per hour would total the amount requested for fees, $67,333.75.  However, the stipulation filed in *Hayes* provided only $62,500.00 for attorneys' fees and $15,531.07 in attorney's costs.  Stipulation at ¶ 3, ECF No. 82.  By comparison, if 244.85 hours were billed at $250.00 per hour the result would be an award totaling $61,212.50, an amount very close to the stipulation's total award for fees.  However, as respondent in *Hayes* may have negotiated a reduction in hours rather than a reduction in Mr. Cave's hourly billing rate, the *Hayes* stipulation and Decision on Attorney Fees and Costs, filed on July 19, 2011, is not dispositive in verifying Mr. Cave's assertion that a rate of $275.00 was used in reaching the stipulation in *Hayes*.

[22] *See Rodriguez*, 2009 WL 2568468, at *14 (stating that rates negotiated between Vaccine Act petitioners' counsel and the Department of Justice were informative, but not dispositive, in determining a "forum rate").

$270.00 per hour for 2013.  These rates are used in Table 1 in Part B,4, Fee Amounts Based on Adjusted Hourly Rates, to calculate the fee award.

B.  Hours Billed.

Mr. Cave seeks reimbursement for a total of 176.8[23] hours spent working on the case.  Pet. Ex. C at 7.  Respondent objected to counsel's accounting of time, and argued that travel time should be billed at half rate, that attorney time spent on paralegal or secretarial tasks should be disallowed or adjusted to a lower hourly rate, and that hours based on entries "too vague to permit review as to reasonableness" and hours that are "excessive" should be reduced.  Response at 7-11.

1.  Travel Time.

In entries on July 25, 2012 and July 26, 2012, Mr. Cave billed a total of 22.75 hours for travel related to the fact hearing in Sacramento, California.  *See* Pet. Ex. C at 6.  Respondent objected to reimbursing Mr. Cave's travel time at the full hourly rate claimed, pointing out that travel time has historically been reimbursed at one-half the hourly rate[24] claimed.  She argued that there was no evidence that work on petitioners' case was performed during travel time.  Response at 9.

Respondent's representations regarding the historical treatment of travel time for billing purposes are correct.  *See Rodriguez,* 2009 WL 2568468, at *21 (citing *Carter v. Sec'y, HHS,* No. 04–1500V, 2007 WL 2241877 (Fed. Cl. Spec. Mstr. July 13, 2007); *Scoutto v. Sec'y, HHS,* No. 90–3576V, 1997 WL 588954 (Fed. Cl. Spec. Mstr. Sep. 5, 1997)).

Mr. Cave replied that he did in fact perform work during some parts of the recorded travel time, including that "counsel brought his laptop and binders on the plane for review, and did in fact review them in preparation for the hearing."  Reply at 5.  Mr.

---

[23] Mr. Cave's billing records reflect time accounting in hours and minutes.  However, his total fee request was for 10,610 minutes or 176.8 hours.  Because this billing method makes calculation of awards more difficult, I have converted time periods billed in minutes to tenths of an hour.

[24] Historically, attorneys in the Vaccine Program have been compensated for all their travel time at half their hourly rate.  This approach recognizes the difficulty of making contemporaneous billing entries for time spent working on the case while traveling, the lack of efficiency in attempting to work on an airplane or other public transportation, and the recognition that no meaningful work can be performed during ticketing, security screening, boarding and exiting an aircraft, recovering checked luggage, and in picking up a rental car.  Compensating attorneys at a full hourly rate for work performed during travel is possible only when the attorney provides sufficient billing records to substantiate that the attorney actually performed case related work during travel.  Like counsel, the special masters frequently travel to hearings and are aware that, even with the best of intentions, working on a case during travel is difficult and only rarely as productive as time in the office in terms of both quantity and quality of work.  Compensating all travel at one-half the hourly rate represents a compromise, recognizing that travel represents some lost opportunity cost for an attorney and that the attorney is less efficient when working on a case during travel.

Cave also included "time spent with petitioners while eating and being transported [by the petitioners]," as it "was spent in reviewing the case and preparing for trial." *Id.* at 6.

Petitioners apologized for their counsel's lack of detailed records to account for his work completed during the 22.75 hours billed for travel. *Id.* They proposed reducing 14.75 hours of time billed during travel to half Mr. Cave's hourly rate, while awarding his full hourly rate for the remaining 8 hours, to account for "one hour each day for lunch with clients,[25] one hour each day for transport to and from Sacramento airport, three hours of case review on [the] plane to Sacramento, and one hour writing notes of court questions and other thoughts post-trial on [the] plane." *Id.*

Although a petitioner's attorney *may* be able to present sufficient documentation for an award of full hourly rates for travel time, each case should be assessed on its own merits. *Gruber v. Sec'y, HHS*, 91 Fed. Cl. 773, 791 (2010). As with other fees, "the underlying guidance for Vaccine Program Special Masters when determining appropriate fee awards is articulated in the Vaccine Act at 42 U.S.C. § 300aa-15(e)(1) and requires that the fees be 'reasonable,'" and the burden is on the fee applicant "to document the fees claim submitted in a manner that will enable the Special Master to reach a reasoned decision." *Id.*

Mr. Cave did not prepare contemporaneous billing records. The practice of compensating attorney travel time at half rate reflects that even if an attorney is performing case-related work, the vicissitudes of travel are such that no attorney is operating at peak efficiency on an airplane or a train, much less while traveling to or from an airport, undergoing security screening, or boarding or exiting an aircraft. The half-rate awarded for all travel time in this case reflects both the lack of contemporaneous billing for case-related work and the lost opportunity costs case-related travel entails.

I will compensate Mr. Cave for all of the time spent in travel (22.8 hours), but at a rate of $133.00 per hour, which is one-half the hourly rate, $266.00, for work in 2012, when the travel was performed. *See* Pet. Ex. C at 6. I therefore reduce Mr. Cave's attorney fees total by $3,032.40. This amount is reflected below in Table 2: Deductions from Total Fee Amount, Section B,5.

2. Secretarial and Paralegal Tasks.

Respondent asserted that some tasks performed by Mr. Cave were secretarial or paralegal in nature and that billing for them should be disallowed or reduced. Response at 9. Petitioners dismissed respondent's objection as "without merit as the tasks were performed by undersigned counsel," arguing that respondent "ignores the fact that technology allows lawyers. . . to perform tasks more efficiently, and not rely on the arcane ways of performing tasks such as dictating a secretary's or paralegal's work, reviewing it, correcting/editing it, etc. Email, for example, is a much more efficient mode

---

[25] The hearing took less than three hours. Tr. at 111.

of communication between a lawyer and client, than dictating a letter, reviewing it for correctness, signing it, etc." Reply at 6-7.

Both arguments have some merit. Mr. Cave is compensated for all client contact, regardless of the methods he employed in such contact.

I agree with respondent that tasks which are secretarial in nature represent overhead expenses and are thus not compensable. *See* Response at 9 (citing *Johnson v. Sec'y, HHS*, No. 90-645V, 1992 WL 247565, (Fed. Cl. Spec. Mstr. Sept. 14, 1992); *Cowan v. Sec'y, HHS*, No. 90-1189, 1993 WL 410090 (Fed. Cl. Spec. Mstr. Sept. 30, 1993). Respondent is correct that, to the extent that tasks are properly characterized as secretarial or administrative, time spent on them is not compensable, regardless of whether the task was performed by counsel or delegated to a secretary.

However, as respondent has not identified any specific tasks as administrative or secretarial and has not asked that I disallow times associated with any specific tasks, I will consider all of the tasks performed in this case that did not require an attorney's skill and expertise to be paralegal in nature.

I also agree with respondent that compensation for paralegal tasks performed by an attorney should be compensated at a paralegal rate. Ordinarily, an attorney should not bill for attorney time for tasks that a paralegal should perform, nor should he bill for paralegal time when the tasks involved are of a secretarial nature. *See, e.g., Plott v. Sec'y, HHS*, No. 92-633V, 1997 WL 842543, at *4-5 (Fed. Cl. Spec. Mstr. April 23, 1997). Respondent correctly noted that attorney work more appropriately performed by a paralegal is compensable, but may be subject to a reduced billing rate. Response at 9-10 (citing *Savin v. Sec'y, HHS*, 85 Fed. Cl. 313 (2008); *Barnes v. Sec'y, HHS*, No. 90-1101V, 1999 WL 797468, at *4 (Fed. Cl. Spec. Mstr. Sept. 17, 1999)). A special master may rely on his or her "experience with the Vaccine Program" to determine that certain tasks are "more consistent with paralegal duties." *Valdes v. Sec'y, HHS,* 89 Fed. Cl. 415, 425 (2009). In the absence of any evidence by either party of an appropriate hourly rate for a paralegal in the Baton Rouge area, I will rely on my experience in the Vaccine Program and compensate paralegal tasks at a rate of $110.00 per hour.

In reviewing Mr. Cave's billing records, I have identified a number of tasks he performed for petitioners which do not require an attorney's skill and expertise, and would more appropriately be performed by a paralegal. Such tasks include preparing exhibit books, filing medical records, labeling and printing photographs, and preparing notices of filings or letters to the "Clerk."

Rather than conduct a line-by-line analysis of Mr. Cave's bill and make specific deductions in specific years, I have approximated the paralegal tasks performed between 2005 and 2014 to constitute 4.3 hours of the total attorney time billed. Using

an average hourly rate of $257.00 for work performed by Mr. Cave from 2005-2014,[26] multiplied times the 4.3 hours, I have deducted $1105.10 from Mr. Cave's total attorney's fees claim for tasks more appropriately performed by a paralegal. I then award 4.3 hours at the paralegal hourly rate of $110.00 per hour to Mr. Cave's total attorney's fees award, which results in an increase of $473.00. The net reduction of $632.10 is reflected below in Table 2: Deductions from Total Fee Amount.

3.  Vague Entries and Unnecessary Hours.

Respondent asserted that some entries (such as those for emails, letters, and phone calls to and from petitioners, time spent reviewing the case file, and time spent on research), are too vague to permit review of reasonableness, and should be disallowed. Response at 11. In addition, respondent called the time billed for some specified tasks "excessive." *Id.* Petitioners replied simply that the level of detail respondent requests is "absurd," and that the record contains a full explanation made contemporaneously with the tasks performed. Reply at 7.

I reject respondent's "vagueness" argument here, but note that explaining what exhibits were reviewed, for example, would obviate the need to respond to such objections. However, my review of Mr. Cave's billing records does disclose some excessive periods billed for performing relatively simple tasks. Non-exhaustive examples of this overbilling include 20 minutes on April 26, 2006 to review a standard order filled in virtually all Vaccine Act cases and billing 30 minutes on May 18, 2011 for filing a short motion for extension of time. Pet. Ex. C at 3. Mr. Cave's records reflect many similar examples of billing excessive time for tasks that should have taken very little time. Such entries are simply unreasonable amounts of time to spend on tasks for attorneys with Mr. Cave's level of experience, in and out of the Vaccine Program. I therefore reduce the total hours claimed by two hours for this overbilling at a rate of $257.00, the same hourly average used in subsection III.B.2, above.

4. Summary for Attorneys' Fees

Based on the hourly rates awarded and the hours requested by petitioners, the following table represents the starting point for fees, prior to any of the deductions for travel, overbilling, or the performance of paralegal tasks.

---

[26] Based on the hourly rates set in Section III A, above, I computed the total fees awarded to Mr. Cave, $45,486.70 as set forth in Table 1, and divided that amount by the total hours originally claimed, 176.8. This resulted in an average hourly billing rate of $257.00 for this case.

**Table 1: Fee Amounts Based on Adjusted Hourly Rates:**

| <u>Year</u> | <u>Hours Billed</u>[27] | <u>Hourly Rate</u> | <u>Total</u> |
|---|---|---|---|
| 2005 | 10.9 | $175.00 | $1,907.50 |
| 2006 | 0.9 | $181.00 | $162.90 |
| 2007 | 1.0 | $186.00 | $186.00 |
| 2008 | 1.1 | $193.00 | $212.30 |
| 2009 | 4.9 | $248.00 | $1,215.20 |
| 2010 | 4.5 | $253.00 | $1,138.50 |
| 2011 | 55.2 | $261.00 | $14,407.20 |
| 2012 | 75.1 | $266.00 | $19,976.60 |
| 2013 | 19.9 | $270.00 | $5,373.00 |
| 2014 | 3.3 | $275.00 | $907.50 |
| **Totals** | **176.8** | | **$45,486.70** |

5.  Deductions from Mr. Cave's Fees.

The total fees calculated using the adjusted hourly rates, $45,486.70, are reduced by the deductions listed below in Table 2, $4,178.50, resulting in a fees award of $41,308.29.

**Table 2:  Deductions from Total Fee Amount:**

| **Reason for Deduction** | **Discussed** | **Amount** |
|---|---|---|
| Travel Time | Section III.B.1 | ($3,032.40) |
| Paralegal Tasks | Section III.B.2 | ($632.10) |
| Overbilling | Section III.B.3 | ($514.00) |
| **Total Deductions to Fees** | | **($4,178.50)** |

C.  Costs.

The special master is charged with determining what fees and costs are reasonable. *See Wasson v. Sec'y, HHS*, 24 Cl.Ct. 482, 486 (1991), *aff'd*, 988 F.2d 131 (Fed. Cir. 1993).  Costs that are not adequately documented may be disallowed. *Sabella*, 86 Fed. Cl. at 209; *Ceballos v. Sec'y, HHS*, No. 99-97V, 2004 WL 784910, at *13 (Fed. Cl. Spec. Mstr. Mar. 25, 2004).

Petitioners requested a total of $4,072.27 in attorney costs.  Pet. Ex. C at 1. Respondent objected to some of petitioners' travel and expert consultation costs as excessive, noting that petitioners did not submit receipts or documentation of any of their costs.  Response at 12, n.9.  Specifically, respondent objected to petitioners'

---

[27] In the future, Mr. Cave should convert any fees application involving periods of less than an hour into tenths of an hour increments, rather than billing by minutes.

request for $108.00 billed by counsel to sit in a higher class of seating during his travel. *Id.* at 12.  I agree with respondent that the extra expense is one for comfort rather than necessary for health, and thus represents an expense which would not be reimbursable for either respondent's counsel or the special master.  This extra cost must be borne by Mr. Cave and not the Vaccine Trust Fund.  This $108.00 cost will be deducted from petitioners' total fee amount, which is illustrated in Table 3:  Disallowed Attorney's Costs.

Respondent also objected to the $2,333.10 invoice submitted by Dr. Stephanie Cave for an "Expert Consultation," citing a global objection to her involvement in the case as unreasonable, and a specific objection to her hourly rate of $350.00 as excessive.[28]  Response at 12.  Respondent notes that Dr. Cave billed two hours for drafting a report that was never filed, and that her work appears to primarily have been in the capacity of a consultant, which is normally billed at a lower rate than a medical expert opinion.  *Id.*

I agree with respondent's characterization of Dr. Cave's role as a consultant in this case rather than a medical expert.  Petitioners did not provide any evidence of her qualifications for expert fees.  She was one of E.L.M.'s treating physicians, beginning her treatment on January 27, 2005, just five days prior to petitioners' initial client call with Mr. Cave and just one month before the claim was filed on February 28, 2005.  Pet. Ex. 11, p. 9; Pet. Ex. C at 3; *see also Mooney v. Sec'y, HHS,* No. 05–266V, 2013 WL 3874444, at *3 nn.13-14 (Fed. Cl. Spec. Mstr. July 3, 2013).  As noted in my fact ruling, Dr. Cave is also the mother of petitioners' counsel, Mr. Cave.  *Id.* at *3.  This familial relationship with Mr. Cave would severely undercut the weight afforded to any expert opinion Dr. Cave might have rendered.

None of Dr. Cave's work product was filed, so I am unable to assess the nature of her contributions directly.  However, the quality of any opinion that this case could or should proceed on a Table injury theory is highly questionable.  As noted in my fact ruling, even accepting the testimony and joint affidavit of petitioners at face value, the symptoms described did not rise to the level of a Table encephalopathy, and both Mrs. Mooney's journal and the video records rebutted the existence of a chronic encephalopathy persisting for the required six months.  *Id.* at *8-11, 14-15.

Nevertheless, even experts with questionable qualifications have been used as consultants in Vaccine Act cases,[29] and their time and efforts have been compensated

---

[28] Doctor Cave's bill indicated an hourly rate of $350 per hour.  However, multiplying the hours billed times that rate, her bill should have been $2,240.00 rather than $2,333.10, the amount actually billed.

[29] For example, despite concerns expressed by both special masters and judges about the qualifications of Dr. Mark Geier as an expert in Vaccine Act cases, his use as a consultant has been approved. Decisions about his lack of qualifications to offer expert opinions include: *Piscopo v. Sec'y, HHS,* No. 01–234V, 66 Fed. Cl. 49 (2005) (approving a determination that  Dr. Geier did not have the education, training or experience to proffer a reliable opinion on autoimmune disorder); *Ormechea v. Sec'y, HHS,* No. 90–1683V, 1992 WL 151816 at *7 (Cl.Ct. Spec. Mstr. June 10, 1992) ("Because Dr. Geier has made a profession of testifying in matters to which his professional background (obstetrics, genetics) is

at a consultant rate.  In Vaccine Act litigation, expert consultants research medical literature and assist in reviewing and assessing the merits of a petition.  *See Ray v. Sec'y, HHS,* 04–184V, 2006 WL 1006587 (Fed. Cl. Spec. Mstr. Mar. 29, 2006).  Expert consultants play an important role in aiding counsel to understand complex scientific and medical questions even if they may not be qualified to offer an expert opinion or if other factors make appearance as a witness problematic.

However, an attorney does not have a blank check to hire anyone as a consultant at any rate to perform any type of service.  Without the check on consultant fees imposed by a private client's concern for his or her bank balance, oversight of counsel's professional obligation to keep consultant fees reasonable is provided by both respondent and the court.  *See, e.g., Kuperus v. Sec'y, HHS,* 01–60V, 2006 WL 3499516 (Fed. Cl. Spec. Mstr. Nov. 17, 2006) (a special master has discretion to review costs charged for experts).  When an expert is retained and files an expert report, the complexity of the issues and the medical records in the case, the nature of research conducted and filed, the expert's qualifications, the quality of the report, and many other factors can be used to assess the reasonableness of the hours claimed.  When no work product is provided to the court by a consultant, the assessment of the reasonableness of the hours and fees claimed becomes far more difficult.

Although I have deep concerns about the potential for bias that arises in cases where the attorney and his expert share a close familial relationship, particularly since they may refer cases to one another, Dr. Cave did not file an expert report or testify.  Moreover, as a treating physician, she may have had insights into this case not readily available to an outside consultant.  Since she served as a consultant, the only work product available is her bill.  *See Carrington,* 2008 WL 2683632, at *10.  Doctor Cave's bill details the time spent on various activities related to the case.  While my experience permits me to appreciate why Mr. Cave sought expert assistance, neither Dr. Cave's hourly billing rate nor the total number of hours are adequately justified.

Petitioners assert that "the first two hours billed by Dr. Cave were as a result of the Court asking counsel to review his files to see what files needed to go forward and what files needed to be dismissed following the conclusion of the Omnibus Autism Proceeding."  Reply at 7.  More specifically, Dr. Cave was asked to review this case and other of Mr. Cave's OAP cases to see "if there were any encephalopathy cases and/or any mitochondrial disorder cases, as opposed to strictly autism cases."  *Id.*  She then was further consulted for trial preparation, in which she reportedly reviewed the medical records, pictures, videos, and journals/records.  *Id.* at 8.

---

unrelated, his testimony is of limited value to the court."); *Daly v.Sec'y, HHS,* No. 90–590V, 1991 WL 154573, at *7 (Cl.Ct. Spec. Mstr. July 26, 1991) ("Dr. Geier clearly lacks the expertise to evaluate the symptomatology of the Table injuries and render an opinion thereon.").  Nevertheless, I authorized the payment of consultant fees to him in *Lamar v. Sec'y, HHS,* No. 99–584V, 2008 WL 3845157, at *15 (Fed. Cl. Spec. Mstr. Jul. 30, 2008).

Of the six hours and forty minutes billed by Dr. Cave, I find that two hours she spent on reviewing the medical records to determine if the case presented a colorable Table claim or another theory of causation after the collapse of the OAP test case theories are reasonable. These hours are consistent with prior awards made to other consultants performing similar reviews in other OAP cases. *See Whiffen v. Sec'y, HHS*, No. 03–1223V, Order of Dec. 15, 2010 at 14-15 (recognizing the reasonableness of awarding fees for a physician's review of clients' medical records).

Additionally, it may be appropriate for a medical consultant to assist counsel in preparing for a hearing. However, I question both the need for Dr. Cave's services in preparing counsel for what was a fairly straightforward fact hearing, and the conclusions drawn regarding the viability of a Table claim based on petitioners' own assertions and the other evidence presented. In this regard, I note that both Dr. and Mr. Cave have advanced a somewhat unusual view of what constitutes a Table encephalopathy, a view I rejected in this case. *Mooney*, 2013 WL 3874444, at *1-2. Both the former Chief Special Master and I similarly rejected this view in *Blake v. Sec'y, HHS*, No. 03-31V, 2014 WL 2769979, at *11-12 (Fed. Cl. Spec. Mstr. June 18, 2008). However, this was the first case of Mr. Cave's in which I ruled on the factual predicate necessary for such a Table injury. Under these circumstances, I approve two additional hours of Dr. Cave's services for hearing preparation. I do note that a review of the medical records, Mrs. Mooney's journals, and the video records would render it virtually impossible to conclude that the minor child sustained an acute or chronic encephalopathy as defined in the Vaccine Injury Table, and I am unlikely to authorize Dr. Cave's consultant fees for hearing preparation in any similar cases filed by Mr. Cave.

I have previously awarded medical consultants a rate of $250.00 per hour based on their limited role in medical records review. *Lamar v. Sec'y, HHS*, No. 99-584V, 2008 WL 3845157, at *15 (Fed. Cl. Spec. Mstr. July 30, 2008) (awarding Dr. Geier $250.00 per hour for his consultant work); *see also Ray v. Sec'y, HHS,* No. 04–184V, 2006 WL 1006587, at *12 (Fed. Cl. Spec. Mstr. Mar. 30, 2006) (awarding Dr. Geier $250.00 per hour for his consultant work). In the absence of any evidence warranting a higher rate, I will award her the same hourly rate. A total cost of $1,000.00 is thus authorized for Dr. Cave's services in this case.

Petitioners' fee application included a statement pursuant to General Order #9 setting forth petitioners' personal litigation costs, representing that they incurred $150.00 in personal litigation costs. Pet. Ex. C at 1. Although petitioners did not document this cost, I will presume it represents the filing fee, and thus find it compensable.

The following table provides a summary of disallowed costs:

**Table 3:  Disallowed Costs:**

| Cost | Amount |
|---|---|
| Airline Upgrade | ($108.00) |
| Consultant Fee for Dr. Cave | ($1,333.10) |
| **Total Deductions to Costs** | **($1,441.10)** |

The total attorney's costs requested, $4,072.27, is reduced by the disallowed costs listed above in Table 3, ($1,441.10), for a total award of attorney's costs in the amount of $2,631.17.[30]

### IV.  Total Award Summary.

Table 4 reflects the total award calculations in this case.

**Table 4:  Total Amount Awarded:**

| Description | Amount |
|---|---|
| Attorney's Fees | $41,308.20 |
| Attorney's Costs | $2,631.17 |
| **Subtotal** | **$43,939.37** |
| Petitioner's Costs | $150.00 |
| **Total Award** | **$44,089.37** |

I hold petitioners are entitled to reasonable attorneys' fees and costs pursuant to § 15(e)(1).  For the reasons contained herein, **I find the amount of $43,939.37[31] in the form of a check payable jointly to petitioners, Bob and Carmel Mooney, and petitioners' counsel of record, Michael Cave, Esq., for petitioners' attorney's fees and costs.  I also find the amount of $150.00 in the form of a check payable solely to petitioners, Bob and Carmel Mooney, for petitioners' personal litigation costs.**

---

[30] *See* Table 4.

[31] This amount is intended to cover all legal expenses incurred in this matter.  This award encompasses all charges by the attorney against a client, "advanced costs" as well as fees for legal services rendered.  Furthermore, 42 U.S.C. § 300aa-15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein.  *See generally Beck v. Sec'y, HHS*, 924 F.2d 1029 (Fed. Cir. 1991).

The clerk of the court shall enter judgment in accordance herewith.[32]

**IT IS SO ORDERED.**

**<ins>s/Denise K. Vowell</ins>**
Denise K. Vowell
Chief Special Master

---

[32] Entry of judgment can be expedited by each party's filing of a notice renouncing the right to seek review.  *See* Vaccine Rule 11(a).